# Exhibit 1

TRANSPERFECT

I, Harvetta Asamoah, hereby certify that I am competent to translate from Spanish to English and that the attached translation is, to the best of my knowledge and belief, a true and accurate translation of the following documents from Spanish to English:

CT-2025-0003_-_DEPARTAMENTO_DE_ASUNTOS_DEL_CONSUMIDOR_v._LUMA_Y_OTROS

Harvetta Asamoah

Harvetta Asamoah

Sworn to before me this
4th day of December 2025

Kurtis M. Estebanez

Signature, Notary Public

KURTIS M. ESTEBANEZ
Notary Public - State of Florida
Commission # HH 606749
My Comm. Expires Feb 22, 2029
Bonded through National Notary Assn.

Stamp, Notary Public

IN THE SUPREME COURT OF PUERTO RICO

| | |
|---|---|
| Department of Consumer Affairs<br>Petitioner<br><br>v<br><br>LUMA Energy, LLC; LUMA Energy ServCo, LLC; Puerto Rico Energy Bureau; Electric Power Authority<br>Appellees | CT-2025-0003 |

**The Associate Judge Mr. Candelario López issued the Opinion of the Court.**

In San Juan, Puerto Rico, on 1 December 2025.

“***In order for power not to be abused, power must restrict power***.” - Montesquieu

At this time, we have the opportunity to reaffirm that the administrative agencies only have the duties and powers that are delegated to them by the Legislative Assembly. Specifically, we are responsible for ruling on whether the Puerto Rico Energy Bureau (NEPR or Bureau) exceeded its authority by granting a liability relief for ordinary negligence to a private entity for damages related to the operation of the electrical system. Thus, we must resolve whether the above-described release constitutes immunity from non-contractual claims by third parties. If we answer in the affirmative, we must assess whether the Bureau, being an administrative forum, has the

legal power to approve, by decision, a disclaimer clause to a private entity.

Because it considers that the relief of liability in question is, in effect, an immunity against non-contractual claims caused by ordinary negligence, and, because it understands that the Legislative Assembly did not delegate to the NEPR the power to grant such immunity, we conclude that the actions of the Bureau are *ultra vires* for violating the doctrine of separation of powers. We should recall that legislative delegation does not represent a waiver of legislative power, but is the expression of its ability to structure, distribute and operationalise public management efficiently.

**I**

This remedy is based on a dispute over the contractual interpretation of a disclaimer. On 22 July 2025, the Department of Consumer Affairs (DACo) filed with the Court of First Instance (TPI) a *Request for declaratory judgement to declare unconstitutional section 4.1(g) of the Puerto Rico Transmission and Distribution System Operation and Maintenance Agreement* (OMA), against LUMA Energy, LLC, LUMA Energy ServCo, LLC, (collectively, LUMA), the Bureau and the Electric Power Authority (AEE). In summary, it requested that Section 4.1(g) of the OMA and the *Decision and Order* issued by the Bureau on 31 May 2021 (NEPR Decision) be declared null and unconstitutional, because it understood that, by this, the NEPR granted LUMA and the AEE almost absolute immunity against consumer claims, which it was

not empowered by law to grant. Consequently, it requests that every citizen be allowed to bring claims for damages caused by the negligence and fluctuation of the electric power service before LUMA.

As stated by the DACo, on 24 February 2021, LUMA submitted to the NEPR a *Request for Approval of Terms of Service and Memorandum of Law in Support*, in which, among other things, it requested that section 4.1(g) of the WCO be approved. It argued that this section provides full relief to LUMA and its employees, officers and contractors against consumer claims for damages caused by negligence or fluctuations in electric service. It maintained that, prior to the signing of the WCO, the public corporation lacked such immunity and had a mechanism for consumers to submit their claims.

It arises from the WCO that the aforementioned Section 4.1(g) states the following:

(Emphasis added).

The DACo added that, on 25 May 2021, the Puerto Rico Energy Bureau held a public hearing for the purpose of listening to the general public regarding the proposed terms of service. Thus, on 31 May 2021, the Puerto Rico Energy Bureau issued its decision in which it determined, among other matters, the following:

(Emphasis added).

According to the DACo, the NEPR Decision amended the

content intended to be adopted from WCO Section 4.1(g) to remove cases of gross negligence of LUMA. In its opinion, it granted a comprehensive release of liability through an “administrative and contractual” process, violating the principle of a legal reservation, since it was not the product of a legislative process. In addition, the DACo argued that the State cannot confer, by administrative and contractual *fiat* quasi-sovereign immunity on a private company without this being evaluated by the Legislature. Thus, it concluded that the NEPR attempts to limit or suppress non-contractual claims to the detriment of third parties without participation or endorsement of the Legislative Assembly, constituting a usurpation of the legislative power and an attack against the doctrine of separation of powers.

Thus, on 24 July 2025, the Puerto Rico Senate and the Puerto Rico House of Representatives filed an *Application and brief by the Puerto Rico Senate and the Puerto Rico House of Representatives as friends of the court.* In summary, they adopted the DACo approach that the NEPR administratively approved a clause of almost absolute immunity in favour of LUMA without the intervention of the Legislative Assembly and to the detriment of non-contracting third parties, understood as consumers. Thus, they alleged that the immunity provided for in Section 4.1(g) of the WCO and the NEPR Decision constitute a violation of the separation of powers enshrined in the Constitution of Puerto Rico. In addition, both legislative bodies held that, by approving the Puerto Rico Electric

Power Authority Act, *infra*, and the Puerto Rico Electric Power System Transform Act, *infra*, they did not delegate to the EEA or the Public-Private Alliance Authority (AAPP) the power to grant immunity in favour of the EEA and LUMA. Therefore, they requested that *the motion for declaratory judgement filed by the DACo be declared* and that Section 4.1(g) of the WCO and the NEPR Decision be declared null and void.

For its part, on 6 August 2025, the Institute of Competitiveness and Economic Sustainability (ICSE) submitted a *Request for Intervention as amicus curiae*, in support of the grant of the remedy requested by DACo. Firstly, it indicated that, in 2021, it litigated the same matter before the NEPR and before the Court of Appeals, although on that occasion it was not recognised with active standing for it.[1]1 The ICSE recognised the constitutional nature of the DACo’s approach to the separation of powers. However, it pointed out that the dispute can be addressed as a matter of strict right of damages, since, contrary to the provisions of the NEPR Decision, our legal system does not allow limiting the categories or amounts of damages that a person can recover as a remedy for the damage suffered. According to the ICSE, in Puerto Rico, liability for contractual or non-contractual damages is a strictly substantive matter, determined by law, so only the Legislative Assembly can create exemptions or immunities. In that sense, it argued that the NEPR legislated immunity that can only be granted by legislative means and, in

---

[1] See *In re: Review of the terms of service of LUMA (extension of liability)*, Case No. KLRA202100406, in which the Court of Appeals dismissed the appeal filed by the ICSE, for lack of active standing.

addition, that we are faced with a contractual matter, not a tariff matter, as the Bureau and LUMA intend to show.

Thus, on 8 August 2025, the DACo submitted an *Intrajurisdictional Certification Appeal* to us. In general, it reiterated the grounds it raised before the primary forum, and argued that, during a public hearing held by the House of Representatives, LUMA admitted not having addressed 1,828 consumer complaints about property damage, loss of equipment and other consequences attributable to electrical failures, for understanding that the NEPR Decision exempts it from doing so. According to the DACo, this public recognition claims that consumers are left without remedies for operational failures of the entity that manages this essential service. In view of this, it held that the dispute is mature for adjudication, and that it merits our urgent intervention to stop this state of defencelessness, restore the constitutional balance and reaffirm that in Puerto Rico no one can operate outside of legal liability.

On 12 August 2025, we issued a *Decision* granting a period of three (3) days for the parties under appeal to make a statement on the appeal in question. On the following day, the ICSE filed a *Motion in compliance with the decision* in which, in support of the appeal being issued, it requested that we consider its arguments as *amicus curiae* before the primary forum, which it reiterated in its brief.

On 15 August 2025, the Senate and House of

Representatives appeared jointly, and adopted the position of DACo as to the constitutional nature of this dispute. Specifically, they highlighted that the doctrine of separation of powers grants them exclusive power to examine, establish and grant immunity against claims for damages.

On that same date, the NEPR filed its *Motion in compliance with the order*, opposing the issuance of the appeal. In the first place, he argued that this is not a substantive constitutional controversy or on the separation of powers. On the contrary, it held that it concerns a release of liability granted as part of a tariff process carried out within the powers delegated to the NEPR, to evaluate modifications to the terms of service related to the liability of LUMA and the AEE for losses of customers and users of the electrical system as a result of its operation.

The Puerto Rico Energy Bureau stated that, a “liability waiver” in the field of companies that provide essential services to the public, aims to prevent the cost of indemnifying claims from substantially increasing the cost of the service, which in most cases would ultimately be paid by the customers and users themselves. It argued that the relief seeks to maintain lower and stable rates, preserving the financial viability of the operation and the continuity of the electricity service. Although it rejected the terms proposed by the parties, it held that it approved certain modifications that it understood to safeguard the public interest, and that it adopted them, after holding public hearings in which the Independent Consumer Protection Office (OIPC) participated.

In addition, according to the NEPR, in this case the urgent criterion that requires the issuance of an appeal

for intrajurisdictional certification is not present, since the relief was adopted four (4) years before the filing of this request for declaratory judgement. It stated that this stage of the proceedings was also not propitious, since the parties had not yet appeared before the court of instance or made discovery of evidence. In short, it insisted that we are not facing a substantial constitutional dispute, and reiterated that it believes users will end up paying for the indemnities granted. Finally, it once again questioned DACo’s standing to bring this action.

Also on that date, LUMA submitted its *Opposition to an appeal for intrajurisdictional certification*. LUMA followed the NEPR's example and questioned the urgency of issuing a certification. It raised, in addition, “jurisdictional matters” that must be addressed by the instance forum before addressing on the merits the validity of the challenged liability relief, namely: (1) the standing of DACo, which, in his judgement, is held by the OIPC; (2) the absence of clear, real, and palpable damage to DACo that allows it to question whether the determination of the NEPR violates the separation of powers or if it deprived the Legislative Assembly of its prerogatives; and (3) the lack of an essential party, due to the absence of the AAPP in the lawsuit. It argued that the limitation of liability of electric service companies responds to a delegation of powers from the Legislature to the NEPR, although it did not cite the specific provision

conferring such power. It repeated, without further elaboration, the argument that the limitation of liability is an inherent part of the rate making process, for the purpose of securing reasonable rates. Regarding the release of liability as a regulatory mechanism, LUMA indicated that it is the standard in the United States and other jurisdictions, since the contrary “would undermine the power validly delegated to the NEPR to fulfil its duties and functions on the making of electricity service rates”.

Finally, the AEE appeared through a brief *Motion in compliance with the order to show cause* to rule in favour of us accommodating and issuing the appeal before our consideration, since “the subscribers of the A.E.E. deserve to be certain about their rights.”

Having evaluated the positions of the parties, on 22 August 2025, we issued a *Decision* in which we issued the appeal for intrajurisdictional certification. Thus, we granted a term of fifteen (15) days to the DACo to present its brief, and fifteen (15) days thereafter to the respondents to submit their position.

On 8 September 2025, the DACo filed its brief. From its point of view, the dispute under our consideration requires answering the following question: can an administrative agency confer on a private operator general immunity from third-party tort claims, including ordinary negligence, without express legislative authorisation?

Given that it did not, it requested that we issue a judgement declaring that such attribution is not possible because it is an act that exceeds the competence of the NEPR and alters the substantive civil liability regime without being allowed to do so by its enabling law.

According to the DACo, its organic law confers on it statutory standing to file this action, since the Legislative Assembly expressly entrusted it to “vindicate and enforce the rights of consumers in all necessary forums”, in any matter “that affects or may affect” its interests. It argued that many consumers have been harmed by LUMA’s negligent acts and others could reasonably be affected if DACo did not intervene. As regards the competence of the OIPC, it held that it is limited to matters related to rates, invoicing, quality of service and other technical aspects of the regulated services, not to substantive rights of consumers in matters of damages. It succinctly argued that there are no essential parties absent from this lawsuit, since, although the AAPP signed the WCO, it did not assume obligations or duties related to this dispute.

On the substantive issues, the DACo reiterated that the limitation of liability in favour of a private operator does not constitute a basic and legitimate component of the electricity rate, but rather an *ultra vires* concession by the NEPR. In this regard, it noted that Law No. 57-2014, *infra*, did not delegate to the

Puerto Rico Energy Bureau the power to release a private operator from civil liability against consumer claims for acts of negligence. It also emphasised that it is constitutionally established that any franchise or concession of a public nature must be determined by law, so it is the responsibility of the Legislative Assembly to grant disclaimers such as that granted by the NEPR. As a consequence, it concluded that the Puerto Rico Energy Bureau exceeded its authority by granting immunity to LUMA without legal authority, so the contested action is null *and void ab initio*.

On the same day, the ICSE submitted an *Amicus Curiae Brief*. The ICSE argued that it agreed with the DACo and the Legislative Assembly that the exemption granted to LUMA is illegal because the administrative determination of the NEPR improperly involves itself in the Legislative Power, benefiting not only LUMA, but the EEA itself. By way of example, it identified several instances in which the legislator granted disclaimers for damages, including to employers under the State Insurance Fund and in cases of malpractice in medical education centres. It also questioned the prudence of empowering a regulator to release entities under its jurisdiction from liability.

On 23 September 2025, LUMA submitted its brief.[2] In

---

[2] Prior to the submission of its brief, on 19 September 2025, LUMA notified this Curia, by means of an *Informative Motion*, that it submitted an *Urgent Motion of LUMA to Enforce the Automatic Stay* in Case No. 17-BK-4780-LTS, currently before the United States District Court for the District of Puerto Rico under Title III of the PROMESA Act.

As applicable, on 30 October 2025, the DACo filed an Informative

its brief, as it did when opposing the issuance of the appeal, it raised the jurisdictional impediments that, in its opinion, must guide our analysis, namely: lack of active standing of the DACo, lack of essential party and, in terms of the unconstitutionality of transferring to the invoices of its clients the compensation payments that it has to make, that DACo requests a consultative opinion. In substantive terms, LUMA emphasised the bases that have justified the granting of liability limitations for utility companies in various U.S. jurisdictions. LUMA argued that the courts of these jurisdictions have validated that the tariff regulation extends to the adoption of limits of liability for negligence, without requiring that the enabling law of the regulatory body expressly empowers it. Based on the premise that the limitation of liability is an inherent part of the delegated regulatory function, it held that the NEPR was empowered to issue its decision.

On that same date, the Senate and the House of Representatives appeared to join the brief by the DACo, making clear their position that the NEPR exceeded its authorities by granting immunity, which only the Legislative Assembly can grant. In particular, they cited Section 13 of Art. VI of the Constitution of Puerto Rico, which, where relevant, prescribes that "[t]he procedure for granting franchises, rights, privileges and

---

Motion in which it attached the Memorandum Order Denying Urgent Motion of LUMA to Enforce the Automatic Stay, of 27 October 2025, declaring that LUMA's request was denied.

concessions of a public nature will be determined by law." Given the foregoing, they requested that the NEPR Decision be decreed null and void.

Within the time granted, the AEE and the OIPC appeared, the latter, through a *Request for Intervention and brief of the auditor, Independent Consumer Protection Office of the Public Service Regulatory Board*. It rejected the position of the DACo that it is not authorised to address constitutional disputes, since Law No. 57-2014, *infra*, empowers it to appear as a petitioning party or as an intervenor in any action related to tariffs, invoices, public policy or any other matter that may affect the customers of the electricity service. On the merits, the OIPC agrees that Section 4.1(g) of the WCO is illegal as it is a "self-relief" of responsibility by the AEE and LUMA in the absence of manifest intention of consumers to relieve them. Likewise, the OIPC stated that the WCO is an adhesion contract in which clients did not participate and therefore should be interpreted restrictively against the agency.

Finally, on 24 September 2025, the Puerto Rico Energy Bureau submitted its brief. In relevant part, the Puerto Rico Energy Bureau reiterated the need and desire for a private operator to have limits of liability for negligence, as well as the source of law he understands supports his action in granting the relief, that is: that is the practice in various states of the United States. In

addition, it raised the same jurisdictional arguments made by LUMA.

After careful evaluation of the arguments of the parties, as well as the briefs submitted by the intervening parties and friends of the court, we proceed to render a decision.

## II

Having in our view a controversy related to a matter of high public interest, namely about the Puerto Rico electricity system, it is advisable that we make a historical account of the facts that precede it.

The history of the Government of Puerto Rico as responsible for producing and managing the country’s electricity originates in the third decade of the 20th century. Faced with the need to produce electricity at a low cost due to the industrialisation process ahead, the *Puerto Rico Reconstruction Administration* (PRRA) aimed at rural electrification of the country. Thus, the PRRA, an agency created by the United States Congress to lead the Puerto Rican recovery after the atmospheric events of 1928 and 1932,[3] determined that the hydroelectric plants to be built would eventually be delivered to the Government of Puerto Rico to be incorporated into the growing electricity system.[4]

---

[3] See Executive Order 7057, *Establishing the Puerto Rico Reconstruction Administration* (28 May 1935).

[4] E. Latimer Torres, *History of the Electric Power Authority: Implantación de los Sistemas de Luz y Fuerza en Puerto Rico 1893-1993 [Establishment of the Light and Power Systems in Puerto Rico 1893-*

Subsequently, with the approval of Law No. 83 of 2 May 1941, currently known as the *Puerto Rico Electric Power Authority Act*, the Fuentes Fluviales Authority (AFF) was created. Among the purposes of the aforementioned statute, the Legislative Assembly sought to centralise the electricity service of Puerto Rico. It was under the development of the AFF, and subsequently, the AEE,[5] that electricity acquired access to the entire Puerto Rican population. However, the projected annual growth rate in electricity consumption was such that it merited the need to increase generation capacity.

As electricity consumption increased, the private company was incorporated into those operations. As an example, by the 1990s, EcoEléctrica was installed in Guayanilla and AES in Guayama, each producing about 15% of the electricity consumed by the country.

Where relevant, the *Energy Transformation and RELIEF Act*, Law No. 57-2014, as amended, 22 LPRA sec. 1051 *et seq*., was approved, whose Statement of Rationale outlines the following:

> After more than seventy (70) years of creation, and more than three decades after fulfilling its total electrification mandate of the country, the AEE has become a monopoly that regulates itself, decides its rates without real monitoring, incurs operational, managerial and administrative inefficiencies, the cost of which at the end of the day is assumed directly by the consumer, and maintains internal governance that

---

*1993],* 1st ed., San Juan, First Book Pub. of P.R., 1997, pág. 342.

[5] Through Law No. 57 of 30 March 1979, the Legislative Assembly changed the name of the Water Source Authority to the Electric Energy Authority.

> lacks transparency and citizen participation. All of this contributes to Puerto Rico being in one of the top positions with respect to higher energy costs among U.S. jurisdictions.

**A. Puerto Rico Energy Bureau**

Pursuant to the *Energy Transformation and RELIEF Act*, *supra*, the Puerto Rico Energy Commission was created, now the Puerto Rico Energy Bureau (Negociado de Energía de Puerto Rico NEPR). 22 (Leyes de Puerto Rico Anotadas) [Laws of Puerto Rico Annotated] sec. 1054b. The NEPR was conceived as a specialised and independent entity, in charge of regulating, supervising and enforcing the public energy policy of the Government of Puerto Rico. 22 LPRA sec. 1051a(j). In order to promote transparency and autonomy in its duties, the NEPR was separated from any of the entities under its jurisdiction. 22 LPRA sec. 1054k.

This was a significant step in the fragmentation of the powers that were, at the time, exclusive to the AEE, and delegated to the NEPR certain powers of oversight as an independent regulator. The powers granted to the NEPR by the Legislative Assembly include the following:

> (a) To supervise and ensure the full execution and implementation of the public policy on electricity service in Puerto Rico;
>
> (b) To establish by regulation the public policy rules in relation to the electric service companies, as well as any transaction, action or omission that affects the electric grid and the electric infrastructure in Puerto Rico, and to implement such public policy rules. These regulations must be consistent with the public energy policy declared by legislation;
>
> (c) To establish and implement the regulations and regulatory actions necessary to ensure capacity, reliability, safety, efficiency and reasonableness in Puerto Rico’s electrical

system tariffs and establish guidelines, standards, practices and processes to follow for energy purchasing processes, the modernisation of power plants or facilities, providing that any contract for the purchase and sale of energy shall comply with the standards, terms and conditions established by the NEPR in accordance with the provisions of the Energy Public Policy Law and this Law.

[…]

(k) To review and approve short-, medium- and long-term policies, strategic plans and plans related to integrated energy resource planning in Puerto Rico, and monitor compliance with them;

[…]

(n) To approve, review and, as applicable, modify the rates or charges charged by the electric service companies or the Contracting Party of the transmission and distribution network in Puerto Rico for any matter directly or indirectly related to the provision of the electric service;

[…]

(nn) To sue and be sued in claims or causes of action in its own name in the Court of First Instance of the Government of Puerto Rico against any natural or legal person that violates or interferes with the requirements, purposes and objectives of this Law, or in any other administrative forum of the Government of Puerto Rico. For such purposes, the Puerto Rico Energy Bureau is recognised with active standing to file the necessary remedies, including and without limitation to request a contempt against any natural or legal person who violates the mandates contained under the jurisdiction of the Puerto Rico Energy Bureau, before the judicial forum to ensure full compliance with the public policy set forth in this Law;

(oo) To adopt rules, pronouncements and regulations that are necessary to fulfil their duties, issue orders and establish fines to comply with the powers granted by law, and for the implementation of this Law. The regulations will be adopted in accordance with Law 38-2017, as amended, known as the “Uniform Administrative Procedure Act of the Government of Puerto Rico”.

[…]

22 LPRA sec. 1054b.

For its part, once the privatisation of the EEA was announced, the *Public Energy Policy Law of Puerto Rico*, Law No. 17-2019, as amended, was approved, 22 LPRA sec. 1141 *et seq.* The purpose of this statute was to facilitate the delivery of EEA operations to private entities. Specifically, it opened the market of the Puerto Rico electrical system to the private company, **subject to the regulation of the NEPR**, by providing that the AEE would not have the exclusive right to produce, transmit, distribute and market the supply of electrical power. 22 LPRA sec. 1141b.

**B. Authority for Public-Private Alliances**

The privatisation of EEA operations is governed by several statutes, including the *Public-Private Alliances Act*, Law No. 29-2009, as amended, 27 LPRA sec. 2601 *et seq*., and the *Law to Transform the Puerto Rico Electricity System*, Law No. 120-2018, as amended, 22 LPRA sec. 1111 *et seq*. The first aforementioned statute establishes the regulatory framework under which the AAPP carries out the privatisation processes of government entities, and the public policy of the Government of Puerto Rico regarding the creation of Public-Private Alliances by contract. 27 LPRA sec. 2604. On the other hand, the second law outlined created the legal scaffolding for the contracts of Public-Private Alliances of the AEE.

In other words, the *Law to Transform the Puerto Rico*

*Electricity System*, *supra*, provides for the sale or transfer of the assets or functions of the AEE, by defining the transactions of the AEE as any through which one or more Alliances are established with respect to any function, service or installation of the AEE or a Contract of Sale of the assets of the AEE related to the generation of power". 22 LPRA sec. 1113(m). Likewise, under both of the aforementioned laws, the AAPP is the entity empowered to carry out any transaction of the AEE. 22 LPRA sec. 1115(b). In addition, the AAPP is responsible for monitoring the performance and compliance of the contracting party under an alliance contract, and providing annual reports on projects conducted. 27 LPRA sec. 2609(d).

For its part, once the AAPP executes an AEE transaction, it is necessary for the NEPR to issue a Certificate of Energy Compliance for it to be perfected. 22 LPRA sec. 1118(a). Thus, when consummating an AEE transaction, the AAPP and the NEPR are the agencies in charge of preparing a work plan for the monitoring of the performance and compliance of the AEE and the contracted entity, according to each alliance or sale contract. 22 LPRA sec. 1118(d).

Thus, under the *Law to Transform the Puerto Rico Electricity System*, *supra*, on 22 June 2020, the AAPP, LUMA and the AEE signed the OMA.

### C. Independent Consumer Protection Office

The *Energy Transformation and RELIEF Act*, *supra*, created the OIPC, with the purpose of educating, assisting and representing the clients of the services under the jurisdiction of the Public Service Regulatory Board of Puerto Rico. 22 LPRA sec. 1054nn(a). Specifically, the Statement of Reasons of the aforementioned statute provides for the importance of the OIPC as an oversight body of the Puerto Rico energy system:

> As an important aspect to ensure citizen participation and oversight in the energy system, the Independent Consumer Protection Office ("OIPC") is created under this Law, **whose function will be to represent and defend the interests of consumers of energy services, both before the Authority and before the** regulatory **entity**. The OIPC shall have a duty, among others, to be an advocate and spokesperson for the interests of customers in all matters before the Energy Commission, including matters relating to billing disputes with the AEE. In addition, it will have the duty to coordinate citizen participation in the internal rate review process of the Authority and before the Energy Commission, as the case may be, in order to guarantee active participation in this process. This new entity ensures that the public does not feel helpless in the power and size of the EEA and other power generators.
>
> (Emphasis added).

Among the powers and duties delegated to the OIPC by the Legislative Assembly, the agency is responsible for the following:

> […]
>
> (d) To file legal claims or remedies with the Energy Bureau, the Puerto Rico Telecommunications Bureau and the Puerto Rico Transportation and Other Public Services Bureau on behalf of and in representation of customers, who do not have other legal representation, in relation to disputes regarding any matter

> affecting the service, rate or in any other matter affecting the interests or rights of electric service, telecommunications and transportation customers. Before filing complaints on behalf of clients, it must verify that the client has complied with the pertinent administrative provisions for their claim. If there is any conflict of interest between different classes of customers with respect to any cause of action or controversy, OIPC's priority will be to represent and defend residential and commercial customers with small businesses;
>
> […]
>
> (h) To participate or appear as an intervening party in any action, before any governmental agency of the Government of Puerto Rico or the Federal Government with jurisdiction, related to tariffs, invoices, public policy or any other matter that may affect consumers and/or customers of electricity, telecommunications and transportation services;
>
> **To participate in or appear as a petitioning party or as an intervening party in any action before the General Court of Justice or before the courts of federal jurisdiction, relating to tariffs, invoices, public policy or any other matter that may affect electric service**, telecommunications and transportation customers;
>
> […]

22 LPRA sec. 1054qq. (Emphasis added). Having outlined the historical background of Puerto Rico's electric power system, we proceed to address the jurisdictional issues.

## III

### A. Standing:

The doctrine of *standing* is defined as "the ability required of the [claimant or plaintiff] party of an action to appear as a litigant before the court, to efficiently perform procedural acts and thereby obtain a binding

judgement.” *Rivera et al. v. Torres et al.*, 214 DPR (Decisiones de Puerto Rico) [Decisions of Puerto Rico] 111, 133 (2024) (citing *Hernández, Santa v. Srio. de Hacienda*, 208 DPR 727, 739 (2022)). Ordinarily, the person seeking a judicial remedy must demonstrate that: (1) he/she suffered clear and palpable damage; (2) the damage is real, immediate and precise, not abstract or hypothetical; (3) there is a reasonable causal relationship between the damage and the action exercised; and (4) the cause of action arises under the Constitution or a law. *Amadeo Ocasio et al. v. Gobernador et al.*, 211 DPR 278, 285 (2023) (Judgement).

However, in the exercise of determining whether the parties have standing to bring an action, the courts must analyse compliance with the aforementioned criteria, **except when there is a statute that expressly confers standing**. *Rivera et al. v. Torres et al., supra.* Therefore, when evaluating the existence of standing we are called to examine whether the Legislative Assembly has granted it by statutory means. That is, **the first step is to determine whether there is statutory standing**. *Rivera et al. v. Torres et al.*, *supra*.

**B. Statutory Standing**

The Supreme Court of Puerto Rico has interpreted the concept of statutory standing since 1974. *Salas Soler v. Srio. de Agricultura*, 102 DPR 716 (1974). That is, it arises when a statute “expressly or implicitly grants an

individual active standing to bring an action, regardless of whether the individual has suffered particular harm, beyond the mere fact of the violation of the law.” J. M. Farinacci Fernós, *Any person: The plenary power of the Legislative Assembly to grant standing by statute*, 84 Rev. Jur. UPR 359, 360 (2015).

In other words, when the Legislative Assembly grants standing by statute, the petitioner is empowered to present their cause of action, subject only to the requirements included in said statute, and regardless of whether they have suffered real and palpable damage. *Rivera et al. v. Torres et al.*, *supra*. In this way, when evaluating the granting of statutory standing, we are called to examine the legislative will as to the circumstances that must be present for a party to be able to bring a matter before the courts. Id.

Our interpretation of the statutory standing doctrine has been consistent. In *Salas Soler v. Srio. de Agricultura*, *supra*, we started from the premise that the Legislative Assembly had full power to grant active standing in any circumstance, and that, therefore, we were responsible for analysing the statutory language to determine the level of standing granted by the legislature. J. M. Farinacci Fernós, *supra*, on p. 139. Subsequently, in addressing matters where the statutory standing of one of the parties has been in dispute, we have applied the same methodology. Id.; *Rivera et al. v. Torres et al.*, *supra*, on p. 134; *Hernández Torres v.*

*Governor*, 129 DPR 824, 835-836 (1992). Thus, **after we recognise the existence of the statutory legitimisation claimed, the courts are called to analyse the scope thereof**, interpreting the intention of the legislator.

**i Standing of DACo**

In our legal system, the organic law of an administrative agency is the legal mechanism by which the Legislative Assembly authorises and delegates the necessary powers for it to act according to the purpose of its creation. *D.A.Co. v. Fcia. San Martín*, 175 DPR 198, 203 (2009) (citing *Amieiro González v. Pinnacle Real Estate*, 173 DPR 363, 371 (2008)). In turn, we have repeatedly stated that, when interpreting the scope of the powers delegated to an agency, we must not limit the analysis of its enabling law to a restrictive interpretation. *D.A.Co. v. Fcia. San Martín*, *supra*, on pp. 203-204.

Where relevant, based on the motives of its organic law, the primary purpose of DACo is to vindicate, protect and implement consumer rights. *Organic Law of the Department of Consumer Affairs*, Law No. 5 of 23 April 1973, as amended, 3 LPRA sec. 341 *et seq*. (DACo Organic Law). In addition to being an agency specialised in assertively and aggressively vindicating consumer rights, DACo was created to be the body capable of removing consumers from their state of defencelessness, enforcing compliance with laws aimed at protecting them, and providing them with adequate representation in the defence

of its rights. Id.

By means of Article 6 of the aforementioned law, the legislature imposed on the Secretary of the DACo the ministerial duty to represent the consumers of Puerto Rico before private entities or public bodies in any matter that affects or could affect its interests. 3 LPRA sec. 341e(e). In addition, this public official also **has the power to appear for and on behalf of consumers, before the courts of the Commonwealth of Puerto Rico and the government of the United States, in any proceeding that affects or may affect the interests of the consumer** in general, of consumer groups or of any particular consumer. 3 LPRA sec. 341e(f).

Likewise, the DACo Organic Law states that the DACo is the agency in charge of promoting and ensuring compliance with all laws, rules, regulations and orders that affect the interests of the consumer, in coordination with the other agencies and departments of Puerto Rico. 3 LPRA sec. 341e(s). This includes the **power to bring any legal remedies necessary to effectuate the purposes of its enabling law.** 3 LPRA sec. 341e(i).

**C. Essential Party**

With respect to the concept of an essential party, Rule 16.1 of Civil Procedure establishes that “[t]he persons who have a common interest without whose presence [a] controversy cannot be adjudicated, shall be made parties and shall be joined as plaintiffs or defendants,

as applicable.” 32 LPRA Ap. V., R. 16.1. This rule is part of the constitutional principle that provides that “no person shall be deprived of their liberty or property without [a] due process of law.” Art. II, Sec.7, Const. PR, LPRA, Volume 1.

In turn, Rule 16.1, *supra*, embodies the fundamental principle of including all parties with interest so that, thus, the judicial decree issued is complete. *Oriental Bank v. Pagán Acosta et al.*, 2024 TSPR 133, 215 DPR (2024) (citing *López García v. López García,* 200 DPR 50, 64 (2018)). On the aforementioned interest, we have expressed on numerous occasions that **it must be a real and immediate one, and that it is not enough to be a speculative or future interest**. *Oriental Bank v. Pagán Acosta et al.*, *supra*; *Allied Mgmt. Group v. Oriental Bank*, 204 DPR 374, 389-390 (2020); *López García v. López García, supra*.

With regard to the absence of an essential party in a lawsuit, we have ruled that its appearance “is such a fundamental interest, which constitutes an irremissible defence that can be presented at any time during the process,” and even appellate forums can and must raise it *motu proprio*. *Oriental Bank v. Pagán Acosta et al.*, *supra* (citing *López García v. López García, supra*, on page 65). Therefore, any judgement issued in the absence of an essential party is null and void, as it deprives the court of jurisdiction over the person on whom it is intended to

enforce an order. *Oriental Bank v. Pagán Acosta et al.*, *supra* (citing *García Colón et al. v. Sucn. González,* 178 DPR 527, 539 (2010)).

Thus, when interpreting Rule 16.1 of the Civil Procedure, *supra*, it is necessary for the courts to evaluate judiciously, with a pragmatic approach, the particularities of each case, and the rights of the parties that are not present in the lawsuit, but whose rights could be affected. *Oriental Bank v. Pagán Acosta et al.*, *supra* (citing J.A. Cuevas Segarra, *Treatise on Civil Procedural Law*, 2nd ed., United States, Pubs. JTS, 2011, T. IV, pp. 1415-1418).

**IV**

Before we enter into the substantive law of the dispute before us, we must address, as a threshold matter, several jurisdictional matters that were raised in the briefs. In other words, we are deprived of the jurisdiction to attend to the lawsuit in question, because the DACo: (1) does not have statutory standing to represent the interests of consumers of the electricity service, since that power corresponds to the OIPC; (2) does not have active standing to urge the lawsuit in question by reason of not demonstrating that it suffered real and palpable damage; and (3) failed to include the AAPP as an essential party. **We submit that you are incorrect.**

It is known that, when evaluating the active standing

of a party to file a lawsuit, the first step is to recognise whether the Legislative Assembly has granted it through statutory means. Therefore, in order to resolve whether the DACo is able to present the cause of action to us, we must initially determine whether there is any statute that expressly grants it standing for this. In other words, we are called to examine the legislative will regarding the circumstances that must be present for DACo to be able to file the appeal for our consideration.

An examination of the DACo Organic Law, *supra*, reveals that the primary purpose of DACo is to vindicate, protect and implement consumer rights, this being the agency responsible for removing the consumer from their state of defencelessness and providing adequate representation in the defence of all their rights. Thus, by Art. 6 of the aforementioned statute, the Legislative Assembly imposed on DACo the duty to “represent the consumer public before any private entity or public body **in any matter that affects or may affect the interests of the consumer.**” 3 LPRA sec. 341e(e).

As the entity in charge of defending the rights of consumers in Puerto Rico, the Legislature granted DACo the statutory standing to appear in the courts, by providing that it is the agency with the power and duty to:

> **Appear for and on behalf of consumers before any court**, board or commission, administrative body, department, office or agency of the Commonwealth of Puerto Rico and/or the United States government **in any hearing, proceeding or matter that affects or may affect the interests of the**

> **consumer** in general, of consumer groups or of any particular consumer.
>
> 3 LPRA sec. 341e(f). (Emphasis added).

Thus, there is no doubt that the Legislative Assembly expressly delegated to the DACo the responsibility to promote and ensure compliance with all laws, rules, regulations and orders that affect the interests of the consumer. 3 LPRA sec. 341e(s). To this end, **it imposed the duty and power to file any legal remedy that is necessary to carry out the purposes of its enabling law**, always having as a guide the protection of the rights of the Puerto Rican consumer. 3 LPRA sec. 341e(i).

Therefore, in interpreting the legislative intent behind the passage of the DACo Organic Law, *supra*, **it is necessary that we recognise the statutory standing conferred on the agency by the Legislative Assembly to appear in court, provided that the matter in question affects or may affect consumer rights**. With regard to the dispute at hand, the DACo maintains that the NEPR Decision has the effect of depriving consumers of electric service of their right to claim damages that may arise as a result of LUMA's negligence, as set forth in our Civil Code. Thus, in understanding that the DACo filed the appeal in question with a view to vindicating a right recognised by our legal system, and having urged it on behalf of the consumer, we reiterate that it has statutory standing to do so.

In turn, we disagree with LUMA's approach in that, under the *Energy Transformation and RELIEF Act*, *supra*, the

OIPC is exclusively empowered to appear judicially in matters related to electric service customers. While it is true that the OIPC was created for the purpose of representing and defending the interests of Puerto Rico’s energy services consumers, when questions of a tariff nature and disputes that require specialised technical expert examination are raised, what is examined in the case in question are general principles of civil and contractual law, such as the validity and scope of disclaimer clauses or the applicability of the principle of legality to which DACo is entitled.

Thus, after recognising the statutory standing conferred on DACo by its enabling law, we proceed to address the issue of the lack of an essential party. In summary, LUMA maintains that the AAPP is an essential party to the lawsuit, since the DACo is requesting the nullity of a clause set forth in a contract where the AAPP serves as administrator. Specifically, it argues that, as administrator, the AAPP is responsible for supervising compliance with said contract, in the manner provided and subject to the terms and conditions set forth in the OMA. Therefore, it argues that the AAPP has a real and immediate interest in the lawsuit, so without its appearance, we would be prevented from issuing an opinion that covers a complete remedy.

For its part, the DACo argues that the NEPR, LUMA and the EEA are the only truly essential parties in the lawsuit before us. Indicates that, although the AAPP was a

signatory to the OMA, Section 4.1(g) of the OMA only established the obligation to request a release of liability from the NEPR. That is, it argues that the clause of the contract alone does not confer any immunity, but rather that it was the NEPR that exercised its primary and exclusive jurisdiction over fees and terms of service to accommodate the immunity request through the NEPR Decision. Consequently, by not being able to force the NEPR to grant immunity, nor to control its scope or content, the DACo proposes that the AAPP could be considered an interested party, but not essential.

As we express, for a party to be considered essential, it must have a real and immediate interest in the lawsuit, and it cannot be mere speculation or a future interest. *Allied Mgmt. Group v. Oriental Bank*, *supra*. Therefore, as a threshold matter, we have the obligation to evaluate whether the rights of the AAPP will be affected, and in what way, by not being present in the lawsuit in question.

It arises from the file that the AAPP was a signatory of the WCO, in its capacity as administrator in charge of supervising the compliance of the parties with the stipulated terms. Therefore, the AAPP is responsible for overseeing the performance and compliance of the AEE and LUMA, and providing annual reports on the progress of the projects. 27 LPRA sec. 2609(d). As its main role, we consider that the AAPP is not an essential party due to the mere fact of having signed as administrator. That is,

what is the real and immediate interest that the AAPP has in the lawsuit does not arise. In conclusion, we assess that the AAPP is not an essential party to the lawsuit before us, for the simple reason that, as administrator, it does not have a real and immediate interest in it. Without a doubt, the rights and obligations of the AAPP will remain unchanged.

Having clarified the aspects of standing and essential party, we proceed to outline the substantive law applicable to the dispute before our consideration.

**V**

**A. Declaratory Judgement**

For its part, the declaratory judgement is a mechanism that is available even if other remedies exist, and has the effectiveness of a final judgement or decision. *Rosario Rodríguez v. Rosado Colomer et al.*, 208 DPR 419, 428 (2021) (citing *Senate of PR v. ELA*, 203 DPR 62, 71 (2019)). In the past, we have defined it as a "remedial and prophylactic mechanism that allows for the anticipation of the elucidation of the merits of any claim before the courts, provided that there is a potential danger against the person requesting it." *Rosario Rodríguez v. Rosado Colomer et al.*, *supra*, on p. 427 (citing *Senate of PR v. ELA*, *supra*); *Beltrán Cintrón et al. v. ELA et al.*, 204 DPR 89, 109 (2020)(citing *Senate of PR v. ELA*, *supra*).

Thus, this extraordinary appeal can be issued in any judicial process where "[t]he alleged facts demonstrate that there is a substantial controversy between parties that have adverse legal interests, without prior injury to them for the purpose of dissipating legal uncertainty and contributing to social peace." R. Hernández Colón, *Práctica Jurídica de Puerto Rico [Legal Practice of Puerto Rico]: Derecho Procesal Civil [Civil Procedure Law]*, 6th ed., San Juan, Ed. LexisNexis, 2017, Sec. 6001, p. 623.

In turn, the mechanism of the declaratory judgement provides that any person whose rights are affected by a statute, municipal ordinance, contract or franchise can request a determination on any divergence in the interpretation or validity thereof, and that a declaration of the rights, states or other legal relationships arising from them is issued. Rule 59.2 of Civil Procedure, 32 LPRA Ap. V. With respect to contracts, they may be interpreted before or after they have been violated. Id.

**B. Separation of Powers**

The doctrine of separation of powers is an essential guarantee of democracy. It is enshrined in Section 2 of Article I of the Constitution of Puerto Rico and provides that "[t]he Government of the Commonwealth will be in Republican form and its Legislative, Executive and Judicial Powers, as stated by this Constitution, will also be subordinated to the sovereignty of the people of Puerto Rico." Art. I, Sec. 2, Const. PR, LPRA, Volume 1. In the past we have mentioned that "[t]he modern state separation

of powers entails a system of counterweights and of wise use of the discretionary power of each branch with the purpose of ensuring a ‘dynamic balance’ that ensures the effective functioning of the Republican system of government.” *People v. González Malavé*, 116 DPR 578, 599-600 (1985).

Thus, the principle of separation of powers, in addition to framing the scope of action of the branches of government, ensures that none of the three branches dominate or unduly interfere with the other. *Senate v. Supreme Court et al.*, 208 DPR 115, 135 (2021); *Rodríguez Casillas et al. v. College*, 202 DPR 428, 450 (2019). After all, the purpose of the separation of powers is to protect the freedom of citizens and ensure the independence of each of the branches of government. *Diaz Carrasquillo v. Garcia Padilla*, 191 DPR 97, 110 (2014).

Likewise, before our duties as a Court of last resort, it is always mandatory to be aware of “the delicate constitutional boundaries that exist between the three (3) branches of government”. *A.A.R., Ex parte*, 187 DPR 835, 855 (2013). In view of this, it should be noted that, “in the normal performance of our review functions under the system of separation of powers, the courts must act with prudence and deference to the legislative will, provided that it is framed within the constitutional scheme.” *Rodríguez Casillas et al. v. College, supra,* on pp. 450-451 (citing *P.I.P. v. C.E.E.*, 120 DPR 580, 611 (1988)). This is because “[w]hen the legislator has manifested itself in clear and unambiguous language, the text of the law is the quintessential expression of all

legislative intent.” *Cuevas v. Ethicon Div. Of J&J Prof. Co.,* 148 DPR 839, 850 (1999).

Thus, when there is a conflict between the constitutional powers of each branch, it is up to the judiciary to define its limits. In this sense, it is our task to “distinguish between ‘authorities that make up the very essence of the system and powers that can be transferred, for compelling reasons, to other branches.’” *Nogueras v. Hernández Colón,* 127 DPR 405, 426 (1990) (citing *In re Rodríguez*

*Torres*, 106 DPR 698, 709 (1978)). Then, taking into account the prevailing historical circumstances, we must “limit the contours of public powers to avoid the undue concentration of powers and promote the most efficient operation of the system.” Id., pp. 426-427.

**C. Power of the Legislative Assembly to grant immunity**

In the field of non-contractual civil liability, “lawful immunity is not merely a defence; it is rather the non-existence of a cause of action.” *Rodríguez Ruiz v. Hosp. San Jorge,* 169 DPR 850, 861 (2007). Accordingly, a person who is immune “cannot be the subject of litigation, whether he or she has performed an act or omission, culpable or negligent.” *Rodríguez Figueroa et al. v. Health Centre*, 197 DPR 876, 884 (2017). The reason for this doctrine is not found in the conduct of the individual, but in the fact that immunity is a prerogative

of the Legislative Assembly, taking into account public policy considerations that transcend the limits of particular acts or omissions. *Rodríguez Figueroa et al. v. Health Centre, supra,* on page 884 (citing *Romero Arroyo v. E.L.A.,* 127 DPR 724, 745 (1991)).

In our legal system, there are different cases in which immunity has been recognised “for reasons of public order or public policy”. *Council Cond. Plaza del Mar v. Jetter,* 169 DPR 643, 656 (2006). An example of this is employer immunity, interfamily immunity, conditional immunity of judges and prosecutors, among other types of immunity. As a corollary, we have emphasised before that, “unless expressly provided that it grants immunity to a group or sector of the population, we must understand that these are subject to the imposition of non-contractual civil liability for their negligent or culpable acts or omissions”. Id., on p. 657.

**D. Obligations and Contracts**

Obligations arise from the law, from contracts and quasi-contracts, and from unlawful acts or omissions in which fault or negligence is involved.[6] 31 LPRA s.d. 2992. As to contractual obligations, they have the force of law, as stipulated between the contracting parties. 31 LPRA s.d. 2994. Accordingly, neither the validity nor the

---

[6] While it is true that the dispute before us arises from acts executed in 2021, these were carried out under the provision of a signed contract before the Civil Code of Puerto Rico of 2020 came into force, 31 LPRA 5311 et seq. Therefore, the Civil Code of 1930, 31 LPRA ant. sec. 1 et seq., is the statutory body applicable to the facts of this case. 31 LPRA secs. 11717, 11718.

performance of the contractual obligations can be left to the discretion of one of the contracting parties. 31 LPRA s.d. 3373.

A contract exists from the moment one or more people are obligated to give something or provide any service. 31 LPRA s.d. 3371. In order for it to be legally effective, the contract must meet the requirements of purpose, cause of the obligation, and the consent of the contracting parties.

31 LPRA s.d. 3391. Thus, provided that these essential conditions are met for their validity, contracts are mandatory. 31 LPRA s.d. 3451. In other words, the contracting parties undertake to comply with what is expressly agreed, as well as all the consequences that, according to their nature, are in accordance with the law, usage, and good faith. LPRA ant. sec. 3375.

On more than one occasion, we have stated that, in our legal system, the principle of freedom of contracting or the autonomy of intent governs. *Cruz, López v. Casa Bella et al.*, 213 DPR 980, 995 (2024); *Coop. Sabaneña v. Casiano Rivera*, 184 DPR 169, 173 (2011). In other words, by means of the principle of *pacta sunt servanda*, the contracting parties are free to establish all the covenants, clauses and conditions they deem appropriate, **provided they are not contrary to laws, morals or public order**. 31 LPRA s.d. 3372.

**E. Right to remedies for damages due to fault or**

**negligence**

In terms of obligations, it is known that culpable or negligent acts and omissions generate extracontractual civil liability. Specifically, Article 1536 of the Civil Code of Puerto Rico of 2020, 31 LPRA sec. 10801, provides that any person who, due to fault or negligence, causes damage to another, is obliged to repair the damage caused. As for this rule, we have reiterated that the compensation for damage only proceeds when the elements of (1) culpable or negligent act or omission; (2) actual damage caused to the claimant; and (3) causal relationship between the act or omission and the damage caused concur. *Sucn. Mena Pamias et al. v. Mélendez et al.*, 212 DPR 758, 768 (2023); *Nieves Díaz v. González Massas*, 178 DPR 820, 843 (2010).

With regard to persons or entities dedicated to generating and distributing electricity in Puerto Rico, since the mid-20th century, we have stated that, given the inherently dangerous nature of said element, they must exercise the highest degree of care to avoid causing damage. *Torres Solís et al. v. A.E.E. et al.*, 136 DPR 302, 311 (1994); *Ramos v. Aut. Fuentes Fluviales*, 86 DPR 603, 609 (1962). However, that does not mean that they respond in any case where damage is caused, but that it is a requirement that the damage has been caused by their fault or negligence, by failing to deploy a degree of care in proportion to the risk or danger involved. *Ramos v. Aut. Fuentes Fluviales*, *supra*. Thus, this degree of care extends beyond the installation, maintenance and operation

of the equipment used for the generation and distribution of electricity. That is, it includes the obligation to conduct an appropriate inspection to discover defects and situations of danger or risk to the public, and to take appropriate precautions to ensure that they do not arise. Id.

However, with electricity generation and distribution being a service of first necessity, we have reiterated that this must not be prevented by requiring that all conceivable protection be adopted by the human mind in order to avoid all possible risks, regardless of their unpredictability. Id., on p. 610. That is, the social benefit provided by electrification cannot be defeated by requiring absolute responsibility from the entities in charge of generating and distributing electricity. Id.

## VI

### A

The dispute before us is limited to determining whether Section 4.1(g) of the WCO and the NEPR Decision grant immunity to LUMA by granting a release from liability against consumer claims for damages caused by negligent acts, service interruptions, and fluctuations in electric service. Pursuant to the appeal for intrajurisdictional certification in the heading, we decided to issue it on the understanding that we have a constitutional dispute of high public interest before us.

We begin by expressing whether the clause challenged by the DACo, namely section 4.1(g) of the WCO and the Decision of the NEPR, cited above, in fact grant the

aforementioned immunity to LUMA. Specifically, in the NEPR Decision, the Bureau determined, among other things, that the EEA, their directors, officers, employees, agents and contractors (including LUMA and their respective directors, officers, employees, agents and contractors) **will not be responsible, contractually or non-contractually, in front of customers or any user receiving electric power or electric service, for any loss arising in any form or in any relationship with the operation of the Transmission and Distribution System and the provision of the electric service, including ordinary negligence.**

As we have reiterated, immunity "is not merely a defence, it is rather the absence of a cause of action." *Rodríguez Ruiz v. Hosp. St. George's, supra*, p. 861. This implies that, whoever enjoys immunity cannot be the subject of litigation regardless of whether they carried out an act or omission, culpable or negligent. *Rodríguez Figueroa et al. v. Health Centre*, *supra*, on page 884. In the case before us, the NEPR approved a provision whose effect is precisely to suppress the possibility of filing a civil claim against LUMA for negligent acts in the provision of electrical service.

In fact, the very text of the clause reveals that it is not a mere tariff limitation, but rather it generally eliminates any possibility of civil liability for ordinary negligence. Specifically, by stating that LUMA and its staff "***shall not be liable contractually or extra-contractually***", the NEPR Decision prevents consumers from

effective access to the courts, since it extends the release to all types of civil, contractual or non-contractual liability. Therefore, it is undoubted that the text of the contested clause imposes a legal barrier that prevents the effective access of consumers to the courts, which, in practice, equates to immunity for LUMA.

However, we have previously stated that, unless expressly provided by the Legislative Assembly that grants immunity to a group or sector of the population, they are subject to the imposition of extracontractual civil liability for their negligent or culpable acts or omissions. *Council Cond. Plaza del Mar v. Jetter*, *supra*, on p. 657. In this way, the validity of an immunity is subject to it being granted by the legislature.

Consistent with the outline, LUMA argues that the limitation of liability of electric service companies that offer essential services responds to the delegation of powers of the Legislative Assembly to the NEPR through the *Energy Transformation and RELIEF Act*, *supra*. In other words, LUMA ensures that under this law, the NEPR holds powers over the setting of tariffs, which, without a doubt, and to its understanding, includes the mechanism of limitation of liability or what, in our opinion, results in the immunity granted.

For its part, the DACo argues that the Puerto Rico Energy Bureau attempted to establish almost absolute immunity by contractual and administrative means, without any intervention of the Legislature. In his opinion, this

violates the constitutional principle of separation of powers, since the Legislative Assembly is the branch of government with the authority to delegate to an administrative agency the power to grant immunity to private entities such as LUMA.

Therefore, **we consider a constitutional dispute strictly related to the validity of a clause approved by the Puerto Rico Energy Bureau that grants immunity to LUMA by releasing it from liability for damages related to the operation of the electrical system**.

In this way, the dispute has been narrowed, we warn that it is not incumbent on us at this stage to adjudicate the effect, if any, that the invalidity of the clause would have on the monthly fee. We clarify that, by express provision of law, the Bureau is the entity empowered to authorise modifications or increases in the electricity rate. Therefore, it is the responsibility of the NEPR to determine whether the payment of compensation for damages constitutes an authorised operational cost for the purposes of reviewing the electricity rate, and if so, to authorise or reject it. Therefore, the aforementioned approach by LUMA and the Bureau will not be addressed in this appeal because it is not amenable to adjudication at this stage.

**B**

However, it is our responsibility to determine whether the Bureau can, under its powers, validate a clause that exempts a private concessionaire from civil liability for essential public service, or whether such

concession is an exclusive prerogative of the Legislative Assembly. In the case of this latter scenario, the absence of express delegation would invalidate the granting of immunity by the Bureau because it is contrary to public order and the constitutional structure of Puerto Rico.

LUMA proposes that the regulatory mechanism of limitation of liability is the norm in the United States and other jurisdictions, and its approval is delegated to energy regulators with powers over rate setting. In this way, it contends that the courts of the United States have determined that commissions or regulatory agencies of utility companies have implicit authority to grant disclaimers. Consequently, it concluded that the limitations of liability are part of the regulatory regime applicable to public services and their legality and interpretation obey such regulations and not contract law.

Before entering into the relevant analysis, it is important to clarify that, unlike the practice in Puerto Rico, in the United States the concept of tariff in public services comprises a set of rules, conditions and charges that govern the relationship between the service company and its customers. 64 Am. Jur. 2d Public Utilities sec. 51 (2025). In addition, under U.S. law, governed by *common law*, regulated public service companies are required to file rates with the corresponding public service commission, which state both the prices of the service and the terms and conditions applicable to the relationship

with their subscribers. Id. Thus, in accordance with the *filed rate doctrine*, once said fees are submitted and approved by the competent administrative agency under the applicable legal framework, they do not merely constitute a contract between the parties, but rather they acquire the force and effect of law. Id. See also *Colich & Sons v. Pacific Bell,* 198 Cal.App.3d 1225, 1232 (1988). Thus, in the United States, the function of setting rates is a quasi-legislative act exercised by an administrative body **empowered by the legislature with that authority**. 64 Am. Jur. 2d Public Utilities sec. 58 (2025).

It should be noted that this doctrine is not limited solely to disputes about the price of the service, but also covers non-tariff aspects, such as terms and conditions of supply, including limitation of liability clauses. Id. (citing *Zurich American Insurance Company v. Southern Connecticut Gas Company,* 442 F.Supp.3d 510, 514 (2020)). Thus, the limitation of liability clauses are intended to restrict the liability of the service company against consumer claims for interruptions, failures or irregularities in the provision of the service. See John L. Rudy, *Limitation of Liability Clauses in Public Utility Tariffs: Is the Rationale for State-Sponsored Indemnity Still Valid?*, 52 Buff. L. Rev. 1379 (2004).[7]

---

[7] Historically, the limitation of liability clauses, also known as *indemnity by tariff*, arose in the United States as a mechanism to protect electric utilities from claims of ordinary negligence. These clauses were incorporated into rates regulated by utility commissions, which controlled both rates and terms of service. Its primary rationale was to avoid costly litigation and keep rates low for consumers within a state-controlled system. Rudy, *supra*, pp. 1393-1395.

**C**

Consistent with the foregoing, LUMA argues that, as in the United States, the Legislative Assembly delegated to the NEPR, through the *Energy Transformation and RELIEF Act*, *supra*, powers over limitation of tariffs that include the mechanism of limitation of liability. Thus, according to the argument, it is the Bureau who has the power in law to approve energy rates proposed by the AEE and other energy companies in Puerto Rico. In addition, it argued that the NEPR has the authority to oversee all types of operations, processes and mandates related to the efficiency of the energy sector, for which it follows structure models of European and Latin American countries and of the public service regulatory commissions established in different states of the United States. Specifically, LUMA cites Art. 6.3(rr) of the aforementioned law to highlight that the provisions of this statute must be liberally interpreted, and that the enumeration of the powers and authorities of the NEPR will not be interpreted as excluding or preventing any other power or authority otherwise conferred. 22 LPRA sec. 1054b.

DACo, for its part, stated that this law does not grant the Bureau the authority to grant immunity to private entities, but rather its regulatory function is limited to ensuring compliance with public energy policy and protecting the interests of consumers of electric power service by supervising the operation of the electric

system. We assert that we agree with the DACo that the *Law on Energy Transformation and RELIEF*, *supra*, does not have any implicit or express expression of the legislator in which the NEPR has been delegated the power to grant immunity in favour of the AEE or LUMA. Let us look.

As we have discussed previously, in our legal system there are different cases in which immunity has been recognised for reasons of public order or public policy. See *Cond Council. Plaza del Mar v. Jetter, supra*, on p. 656. However, we have been extremely cautious in insisting that, unless expressly provided that it grants immunity to a group or sector of the population, we must understand that these are subject to the imposition of extracontractual civil liability for their negligent acts or omissions. Id., on p. 657. Thus, for example, it was created by statute: a waiver of liability for damages to employers under the State Insurance Fund;[8] an immunity to certain health professionals and institutions against civil action for damages due to fault or negligence due to professional malpractice;[9] among other cases.

**D**

In view of the aforementioned law, we analyse the relevant provisions of the *Energy Transformation and RELIEF Act*, *supra*, in order to identify whether the

[8] See Art. 18 of Law No. 45 of 18 April 1935, as amended, Workers' Compensation System Act, 11 LPRA sec. 21, in which it establishes employer immunity and the exclusivity of the remedy against any claim, provided that said claim arises from an injury, illness or death covered by said law.

[9] See Art. 7 of Law No. 136 of 27 July 2006, as amended, known as the Regional Academic Medical Centres of Puerto Rico Act, 24 LPRA sec. 10035.

legislator expressly granted immunity to electric service companies for civil liability actions or, if it granted the NEPR the power to grant it. Art. 6.3 of the aforementioned statute provides an extensive list of the powers and duties of the Bureau, among which are: approving fair and reasonable rates; monitoring compliance with public energy policy; issuing regulations; ordering investigations and hearings; imposing fines for non-compliance; and ensuring the protection of consumers. 22 LPRA sec. 1054b. A thorough examination of the list of powers and duties of the NEPR allows us to conclude that, in effect, **there is no provision that expressly delegates power to the NEPR to grant immunity or limit the liability of electric service companies in the scope of civil liability**.

We note that subsection (rr) of Art. 6.3 of the aforementioned law provides that “the actions, regulations and determinations of the NEPR will be guided by applicable laws, by the public interest and by the interest of protecting the rights of customers or consumers.” 22 LPRA sec. 1054b. In addition, the same subsection establishes that “[t]he provisions of this Law will be liberally interpreted to be able to achieve their purposes and wherever any specific power or authority is given to the NEPR, the list shall not be interpreted as excluding or preventing any other power or authority otherwise conferred upon it.” Id. Likewise, the aforementioned subsection clarifies that the NEPR “will have, in addition to the powers listed in this Law, all the additional implicit and incidental powers that are

appropriate and necessary to carry out and perform, exercise all the aforementioned powers and to achieve the purposes of this Law.” Id.

As to the latter, **even though this subsection recognises implicit and incidental powers to the Bureau, we specify that these should be interpreted in light of the law and in the public interest, including protecting the rights of consumers and not restricting them.** The statement on the liberal interpretation of the provisions of the law, while seeking to expand the regulatory power of the NEPR, is not sufficient to conclude that it has been granted powers to alter the civil liability regime that governs our legal system. We reiterate that an expansive interpretation of the powers of the NEPR cannot exceed the limits imposed by fundamental principles of civil law. Therefore, **we conclude that there is no delegation in the *Energy Transformation and RELIEF Act*, *supra*, that confers powers on the NEPR to grant immunity or limit the civil liability of energy companies.** A delegation of such magnitude obviously requires a clear and unequivocal legislative manifestation, and this is not the case in the aforementioned statute.

A public corporation lacks the power to alter the non-contractual liability regime of the civil system. An administrative decision cannot de facto create immunities that the law does not confer or authorise to be conferred. The customer is not a party to the contract between the corporation and the contractor, and the law recognises direct action against the person causing the damage.

However, the clause examined here should not be confused with a typical *hold harmless clause*. An indemnity or *hold harmless* clause is an agreement whereby one party contractually assumes the obligation to defend, indemnify or hold the other harmless against third party claims arising in the performance of the contract. Its effect operates solely between the parties. That is, it does not suppress the direct action of the injured third party or create any exemption from substantive liability. On the other hand, a clause such as the one endorsed by the NEPR, which fully exempts PREPA and LUMA from non-contractual liability, is not merely an allocation of risk, but an attempt to establish quasi-legislative immunity by contract. We reiterate that this prerogative belongs solely to the Legislative Assembly. Therefore, any administrative decision that extinguishes the ability of third parties to invoke a cause of action recognised by law violates the constitutional doctrine of separation of powers.

The separation of powers “is the safeguard that our Constitution enshrines to preserve the freedoms of the People and a democratic system of government.” *Domínguez Castro et al. v. ELA I*, 178 DPR 1, 91 (2010). As we stated, “the separation of powers entails a system of counterweights and of wise use of the discretionary power of each branch in order to ensure a ‘dynamic balance’ that ensures the effective functioning of the Republican system of government.” *People v. González Malavé*, *supra*, on pp.

599-600. **In this case, we decide that the *Law of Energy Transformation and RELIEF*, *supra*, lacks an express provision that authorises the NEPR to grant immunity or alter the civil liability regime**, so its action lacks a legal basis and is *null and void ab initio*.

By creating an immunity regime through the NEPR Decision, the Bureau invaded the exclusive sphere of the legislative power, since only the Legislative Assembly has the constitutional prerogative to define the cases in which a waiver of liability is applicable. **We reiterate that the power to determine when and under what conditions a private entity can enjoy immunity responds to a public policy decision that only the legislator, not an agency by administrative decision**, can make. Accordingly, NEPR’s attempt to confer immunity to LUMA constitutes a direct violation of the constitutional principle of separation of powers.

## VII

Based on the foregoing, we decide by *Declaratory Judgment* that Section 4.1(g) of the OMA and the NEPR Decision are unconstitutional because they violate the separation of powers doctrine, without violating the rest of the OMA, which remains in effect. In addition, claims filed by consumers must be handled in accordance with established procedures.

Within the meaning of the outline, we reiterate that the authority to grant immunity to a private entity is a

public policy decision that can be made only by the Legislative Assembly.

Judgement shall be issued accordingly.

Raul A. Candelario López
Associate Judge